Benjamin E. and Ida Lewis v. Commissioner. Benjamin E. Lewis v. Commissioner.
Lewis v. Commissioner
Docket Nos. 52587, 52588.
United States Tax Court
T.C. Memo 1957-158; 1957 Tax Ct. Memo LEXIS 92; 16 T.C.M. (CCH) 658; T.C.M. (RIA) 57158; August 12, 1957
*92 The principal petitioner operated a store and pawn shop; and he also purchased diamonds, bought and sold securities through a brokerage account, and held rental properties. He and his wife maintained several bank accounts, in one of which frequent deposits were made. His accounting records were incomplete and inadequate to reflect taxable income. Some of the items on the returns were lump sums which were not susceptible of verification; and some transactions were not reported. The respondent determined, by use of the bank deposit method, that there were substantial understatements of net income for all years involved. Held, that reconstruction of petitioner's income by use of the bank deposit method was justified; and that, after allowance for certain additional adjustments, there was an understatement of net income for each of the years involved. Determination is made of the amounts of such understatements. Held, further, that at least part of the deficiency for each year was due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. Held, further, that assessment of the several deficiencies and additions to tax are not barred by the statute *93 of limitations, because the return for each year was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. Downey Rice, Esq., 1025 Connecticut Avenue, Washington, D.C., for the petitioners. John C. Calhoun, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: These two cases, which were consolidated for trial, involve deficiencies in income tax and additions to tax for fraud, determined by the respondent as follows: Docket
Addition to tax
No.
Petitioner
Year
Deficiency
Sec. 293(b)
52588
Benjamin E. Lewis
1945
$18,273.10
$9,136.55
1946
11,991.44
5,995.72
1947
9,777.21
4,888.61
52587
Benjamin E. and Ida Lewis
1948
3,070.76
1,535.38
1949
1,445.42
722.71
*94 The issues for decision are: (1) Whether the amounts of gross income and net income reported by the petitioners on the return for each of the 5 years here involved were understated, as determined by the respondent. (2) Whether for the year 1947, petitioner Benjamin E. Lewis should be allowed a long-term capital loss of $200 on the sale of corporate stock, which was not reported on his return. (3) Whether any part of any deficiency for each of the years involved is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. (4) Whether assessment of any deficiency or addition to tax for each of the years involved is barred by the statute of limitations. The determination of this issue requires answers to the following questions: (a) As to each of the years involved, was the return false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code? (b) As to each of the years 1948 and 1949, did the petitioners omit from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, within the meaning of section 275(c) of the 1939 Code? *95 All other issues raised by petitioners in their pleadings were abandoned at the trial. Findings of Fact The petitioners, Benjamin E. Lewis (hereafter called the "petitioner") and Ida Lewis, are husband and wife. Petitioner filed an individual income tax return for each of the years 1945, 1946 and 1947 with the then collector of internal revenue for the district of West Virginia; and he and his wife filed a joint return with the same collector for each of the years 1948 and 1949. The petitioner was 57 years of age at the time of the trial. He had attended school through the seventh grade, and entered business at an early age. In about 1920, he opened a retail store in Mt. Hope, West Virginia, for the sale of army surplus under the name of Ben's Army Store; and from time to time thereafter, he operated other stores under the same name in Parkersburg, Logan and Beckley, West Virginia. At the beginning of the period here involved, he had two stores in Beckley; but he sold one of these in 1946. Also in or after the year 1949, he opened a men's apparel shop on Connecticut Avenue in Washington, D.C., for the benefit of his son. He was an investor in securities through a brokerage account *96 which he maintained; he had sold real estate; and during all years involved he owned an apartment house and a frame dwelling which he held for rental purposes. His testimony and demeanor at the trial indicated that he was intelligent and capable, and familiar with business and financial affairs. The record contains no description or facts respecting the store in Beckley which petitioner sold in 1946, and which he had operated during 1945 and part of 1946, the first 2 years here involved. His other store in Beckley was opened in about 1942; and he operated it throughout the period involved, as a sole proprietor under the name of Ben's Army Store. It occupied a one-story structure, and had a frontage of about 25 feet. Its principal stock-in-trade was work clothing for miners employed in the vicinity, which included work shoes, overalls, pants, jackets, underwear, and miscellaneous furnishings. The prices were moderate; for example, shoes were sold for about $4.95, overalls for about $1.95, and pants for about $2.95 to $3.95 per pair. All sales were on a strictly cash basis. The amounts of the total store receipts, net cost of goods sold, other business deductions, and net profit or *97 loss, as reported on the return for each of the years here involved, were as follows: Total
Net cost of
Other business
Net profit
Year
receipts
goods sold
deductions
or (loss)
1945
$125,900.06
$93,072.34
$21,976.26
$10,851.46
1946
126,419.41
97,028.34
19,105.37
10,285.70
1947
67,196.74
44,988.11
15,449.83
6,758.80
1948
64,997.41
45,254.87
14,331.67
5,410.87
1949
43,198.92
29,571.96
15,630.59
( 2,003.63)
In one corner of the store, petitioner operated at all times here material, a licensed pawn shop which catered to miners in the making of small loans of $5 or $10 each, against watches, rings, and other items of value. Interest was charged on $5 loans at the rate of $1 for each 30 days; and on $10 loans at the rate of $2 for each 30 days. If a pawned article was not redeemed within 3 months, it was forfeited and sold by petitioner in his store, at a mark-up of about 50 per cent over the amount of the loan. Approximately one-third of the articles pawned were not redeemed by the borrowers. The amounts of interest income from the pawn business, as reported on the returns for the several years here involved, were as follows: *98 1945
$1,036.00
1946
1,422.50
1947
3,419.50
1948
6,503.08
1949
5,949.00
The store was operated by two employees, in addition to the petitioner. One of these named Walker took charge whenever petitioner was absent - as he was from time to time on extended trips to New York City and elsewhere. The store sales were rung up on a cash register that had a recording tape. Both petitioner and each of his employees had access to this register. Interest received on pawn shop loans was not recorded on the cash register, but was placed in an envelope which petitioner kept personally. In the rear of the store there was an office safe; and within this, there was a small inner safe. Petitioner made daily deposits of proceeds of store sales, in a checking account which he maintained at the Beckley National Bank; and, if he was out of the city, his employee Walker would make such deposits for him. Petitioner also drew checks on this account, for store expenses and for certain merchandise purchased. In addition he used the account for personal purposes. At times, he cashed checks, without depositing the proceeds. Petitioner alone had authority to draw checks on the bank account. *99 In addition to the above-mentioned checking account at the Beckley National Bank, petitioner's wife had a checking account in the same bank; and also petitioner and his wife each had a personal savings account there. In addition, petitioner and his wife had a joint savings account at the Raleigh County Bank; and, also, petitioner had a personal savings account in this bank. All these various bank accounts were maintained throughout the 5 years here involved. A summary of the deposits made therein during said period is hereinafter set forth. None of the interest on the several savings accounts was reported by petitioner or his wife on the return for any year, due to petitioner's failure to realize that such amounts constituted taxable income. Petitioner from time to time purchased diamonds. These were of two classes: Some were relatively expensive, having a value of from $1,000 to $1,500 each; and others of smaller size were either purchased or taken out of the pawn business. Not all of the diamonds were for sale to customers. In 1945, he purchased one lot of diamonds at a total cost of $3,875, partly by check and partly by cash; of which $1,590 was supplied to him by a third party *100 for whom he purchased a diamond as an accommodation. There is other evidence of diamonds purchased in 1945 for $255, and in 1947 for $1,225. Some of the purchases of diamonds were billed to him on invoices, which were charged to cost of goods for the store. There is no evidence respecting the total number of diamonds purchased by petitioner; and, except as above mentioned, there is no evidence as to the cost or date of acquisition of any diamonds held by him during the years involved. Petitioner maintained a brokerage account with Harris-Upham & Co., through which he purchased, sold and held securities. He had had this account since 1932; and, yearly since then, he had transactions therein. Also he purchased various Government bonds, including $2,000 of such bonds in December 1944. The only dividends reported on his return for any of the years here involved were for the year 1949 in the amount of $1,150. No sale of securities, or any other capital asset, was reported on the return for any year involved, except the year 1945 when petitioner reported the sale of two securities for the aggregate sum of $6,959.81. In addition to the security transactions handled through Harris-Upham *101 & Co., petitioner in 1947 sold certain shares of stock in a Beckley newspaper for the price of $800. He had bought these shares in 1945 at a cost of $1,000; and he incurred a long-term capital loss of $200 on their sale. The sale was not reported by him on his return for 1947 or any other year. Petitioner, in the year 1946, made a bulk sale of all the merchandise contained in one of the two stores which he had theretofore operated in Beckley. He received a check for $35,000 in payment for such merchandise. He did not know "whether I made or lost" on the transaction. The sale was not reported by petitioner in his return for 1946 or any other year. There is no other evidence respecting the transaction; and neither the identity nor the inventory cost of the merchandise sold was established. None of petitioner's bank accounts disclose that the $35,000 check was deposited. During all years here involved, petitioner owned two buildings from which he received rents. One of these was a frame building, with respect to which petitioner reported gross rentals on his returns in the amounts of $360 for each of the years 1945 and 1946, $450 for the year 1947, and $480 for each of the years *102 1948 and 1949. The other building was a brick apartment, in respect of which petitioner reported gross rentals in the amounts of $2,640 for each of the years 1945 and 1946, $2,716.25 for each of the years 1947 and 1948, and $3,202 for the year 1949. Petitioner maintained no cash book, journal or other book of original entry from which the amounts of his gross income and net income for any of the 5 years involved could be determined. As regards the sales of merchandise in his stores, his only original records of such sales were certain cash register tapes; and such tapes were incomplete for each year. Also, his only original record of merchandise purchased consisted of certain invoices, certain canceled checks of which many were issued to "cash," and certain check book stubs; and these, likewise, were incomplete as to any year. There were practically no original records for 1945 and part of 1946. Physical inventories of the store merchandise were made annually by petitioner and his employees. The record of these was kept by petitioner, personally, in a memorandum book. This book was not offered or received in evidence. The only record of petitioner's pawn broker business likewise *103 was a small memorandum book kept by petitioner personally. This book contained a list of the pawn tickets issued, the amounts of the loans, the dates on which interest became due, and notations as to whether the articles pawned had been redeemed. The amounts of interest received were not entered in this book, but there were pencil notations totaling the amounts from the other data shown. As before stated, the interest received from the pawn business was not put through the cash register, but the amounts thereof were kept by petitioner in an envelope. Petitioner's only formal accounting records was a so-called ledger, in single entry form. This was maintained for him by a bank employee, named Milliron, who called at the store about once a month to make the entries. Milliron also prepared the income tax returns of petitioner and his wife, for all years involved. He had no accounting training, and no bookkeeping experience, except that which he acquired at the bank. Petitioner paid him $10 per month for all his services. The manner in which Milliron kept the so-called ledger was as follows: Upon calling at the store on his monthly visits, he would pick up a manila envelope in which *104 petitioner had placed various cash register tapes, invoices, canceled checks and check stubs relating to the store operations. He would then classify and make entries of these in columns of the ledger, which contained headings such as "sales," "purchases," "salaries," and "miscellaneous expenses." There also was a column, headed "Ben Lewis," for the entry of personal expenditures made on behalf of the petitioner. The amounts of the "sales" were entered from cash register tapes; and these were on a strictly cash basis. The costs of merchandise purchased were entered from various invoices, some of which were paid and others were unpaid, and also from canceled checks contained in the manila envelope. And the amounts of the salaries, miscellaneous business expenses, and personal expenditures of the petitioner were likewise entered from various canceled checks and check stubs contained in the envelope, some of which represented an aggregate of several items. Milliron made an entry for every invoice and check submitted to him; but frequently, he was unable to determine whether a particular invoice or particular check represented a business expenditure for the store, or a personal expenditure *105 for the petitioner. In such situations, he sometimes consulted with the petitioner regarding the items, but in other cases he merely exercised his own judgment in classifying them. There probably was some duplication in the entries for cost of goods purchased, due to the fact that Milliron entered such costs from invoices without knowing whether or not they had been paid, and also made entries from canceled checks which may have been subsequently issued in respect of the same purchases, but which he was unable to relate to any prior invoices. The making of entries for cost of goods sold, on the basis of both unpaid invoices and canceled checks, caused this portion of the accounts to be partly on a cash basis and partly on an accrual basis; although "sales" were entered on a strictly cash basis. Petitioner was familiar with the method of bookkeeping being so employed; and he also was aware that Milliron was not able to determine whether or not the invoices from which the entries were made had, or had not, been paid. The returns for all years here involved were prepared by Milliron, partly from entries in said so-called ledger, and partly from various lump sum figures supplied to him *106 by the petitioner. The store "sales" and "expenses" were taken from said ledger, where they had been computed in the manner above described. As regards the amounts of the inventories shown in the returns, Milliron used the totals shown in the memorandum book of physical inventories, which petitioner kept personally. He simply took such inventory figures as were supplied to him for the beginning and end of each year; and then, taking the merchandise purchases and miscellaneous expenses entered in the so-called ledger, he mathematically computed the amounts of the "cost of goods sold" and the "net profit or loss" for each year, and inserted the same in the returns. As regards the income from petitioner's pawn business which was set forth in the returns, the amounts of this were supplied to Milliron by the petitioner in lump sum figures. Milliron never verified any of such amounts. The same were computed by petitioner on the basis of fiscal years running from December 1 to November 30, notwithstanding that all other items in the returns were computed on a calendar year basis. The amounts of dividends and rents reported in the returns also were supplied to Milliron by the petitioner *107 in lump sum figures. As regards security transactions with Harris-Upham & Co. account, there was usually a broker's statement; but there was no other record respecting capital assets. As before stated, no interest on the savings accounts maintained by petitioner and his wife was returned for any year. Milliron had nothing to do with any of the bank accounts of petitioner and his wife; and he never attempted to reconcile any of petitioner's receipts or disbursements with such accounts. Also he never ascertained the amounts of cash on hand in the store, never examined the contents of the store safe, and never saw any of the diamonds or knew the purpose for which they were purchased. Petitioner looked over the returns after they were prepared; but he made no attempt to check or verify them. The respondent's agents, upon their examination of the returns for the several years here involved, concluded that the records of petitioner and his wife were incomplete and inadequate to reflect the taxable income for any year. They therefore employed the so-called bank deposit method, for the purpose of reconstructing the gross income and net income of each year. The amounts of the total deposits *108 in the six bank accounts of petitioner and his wife, for the years here involved, were: Beckley National Bank
1945
1946
1947
1948
1949
Mr. Lewis: Checking account
$141,340.68
$150,658.02
$92,327.61
$84,176.16
$74,465.40
Savings account
13,614.00
Int. on Savings account
148.54
137.96
139.35
63.54
Mrs. Lewis: Checking account
2,432.84
3,719.74
2,550.00
292.25
1,782.45
Savings account
10,494.12
2,551.08
Int. on Savings account
35.57
118.28
133.36
133.64
54.78
Totals
$167,917.21
$157,195.66
$95,148.93
$84,741.40
$76,366.17
Raleigh County Bank
Mr. or Mrs. Lewis: Savings account
$ 10,000.00
Int. on Savings account
58.35
$ 100.79
$ 81.66
$ 112.70
Mr. Lewis: Savings account
5,000.00
2,270.00
Int. on Savings account
20.75
50.32
41.23
96.70
Totals
$ 15,079.10
$ 151.11
$ 2,392.89
$ 209.40
Aggregate deposits in both banks
$167,917.21
$172,274.76
$95,300.04
$87,134.29
$76,575.57 The petitioners and the respondent are in agreement as to the amounts of all the above-mentioned deposits. Respondent's agents made an extensive examination of all records submitted to them by the *109 petitioner, and also of all records maintained by the banks in respect of the accounts for him and his wife. They made viewings of the bank records through use of a Recordak machine; and made copies of all pertinent records for use in schedules which, by agreement of the parties, were used at the trial in lieu of the original bank records. In addition, respondent's agents made a list of all transfers of funds between the several bank accounts, which they could identify either from the checks and deposit slips, or from similarity of dates and amounts; and they eliminated these from the aggregate amounts of the deposits. They also deducted all deposits of borrowed moneys and other nontaxable receipts, which they were able to identify. Furthermore, for the purpose of arriving at net income, they allowed petitioners all deductions claimed in the returns except certain minor items disallowed in the notices of deficiency in respect of which no error was assigned by petitioners. The revenue agents, during the course of their examination, inventoried the contents of petitioner's office safe. They also had three conferences with petitioner, one of which was attended by his wife; and, during *110 these, they sought an explanation of the sources of the bank deposits. During one of the interviews with petitioner, he executed a written statement under oath, in which he said that the amount of his living expenses for each of the years involved was about $7,000; and in which he further said that he never had cash on hand in any year in excess of $500. These statements were reaffirmed by him during each of his two subsequent conferences with respondent's representatives. Each of the two notices of deficiency herein was issued on January 25, 1954, which was more than 3 years after the filing of the returns for all years involved, and within 5 years after the filing of the returns for the years 1948 and 1949. The determinations made by the respondent in each of said notices of deficiency were based on the results of the above-mentioned examinations of his revenue agents; and the amounts of net income attributed to petitioner and his wife were computed through use of the so-called bank deposit method, as applied by the revenue agents in the manner above described. The amounts of the gross receipts reported on the returns, as compared with the bank deposits for corresponding years *111 after the adjustments above mentioned, were as follows: Gross
Bank depos-
receipts
its after
Year
per return
adjustments
Excess
1945
$129,936.06 *
$158,772.11 *
$28,836.05
1946
130,841.91
152,663.35
21,821.44
1947
73,782.49
92,526.33
18,743.84
1948
73,645.41
83,242.38
9,596.97
1949
53,979.92
60,174.33
6,194.41
Totals
$462,185.79
$547,378.50
$85,192.71
The amounts of the net incomes reported on the returns, the amounts of such incomes as adjusted by respondent, and the amounts of the understatements of such net incomes as determined by the respondent, are as follows: Understate-
Net income
Net income
met of
Year
per return
as adjusted
net income
1945
$14,207.89
$ 43,859.38
$29,651.49
1946
12,187.56
34,928.98
22,741.42
1947
11,180.47
30,645.78
19,465.31
1948
10,903.58
22,074.83
11,171.25
1949
5,021.79
12,003.47
6,981.68
Totals
$53,501.29
$143,512.44
$90,011.15 The deficiencies determined by respondent in his notices of deficiency reflect the understatements of net income above *112 shown. The correct amounts of the understatements of net income of the petitioner and his wife for the several years here involved, after additional adjustments in their favor which we have determined to be proper, are: Understatement
Year
of net income
1945
$25,055.61
1946
22,741.42
1947
19,365.31
1948
8,901.25
1949
6,981.68
The amounts of gross income reported on the returns for the years 1948 and 1949, and the amounts of the omitted gross income for said years which in each case is in excess of 25 per cent of the gross income reported, are as follows: Gross income
Gross income
reported
omitted
Year
on return
from return
1948
$28,390.54
$8,901.25
1949
24,407.96
6,981.68
At least part of the deficiency for each of the years involved is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. Assessment of the deficiency and addition to tax for each of the years involved is not barred by limitation. The return for each of said years was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. Also, as to each of the years 1948 and *113 1949, the period for assessment was 5 years after the date for filing the return, under the provisions of section 275(c) and (f) of the 1939 Code; and the notice of deficiency was issued within said period. Opinion I. The first issue for consideration is whether the amounts of gross income and net income reported on the returns for the 5 years here involved were understated. In connection with this issue, we shall also consider the second issue above mentioned, pertaining to whether petitioner should be allowed a long-term capital loss of $200 on the sale of certain corporate stock. The understatements of gross income and net income determined by respondent in his notices of deficiency were computed by use of the so-called bank deposit method. This is a method for reconstructing income. Like the net worth method, it is predicated on a basic assumption that most assets derive from a taxable source, and that when this is not true the taxpayer is in a position to explain the taxpayer is in a position to explain the discrepancy (see ; and accordingly that, where a taxpayer had business or other activities which were a likely *114 source of income, and made frequent deposits in a bank account which he controlled, such deposits, to the extent that they are unidentified, unexplained and not found to have been derived from a nontaxable source, may support a determination that they represented gross income for the year of deposit. Both this Court and others have approved the use of the bank deposit method in many cases. (C.A. 6); (C.A. 3), affirming Memorandum Opinion of this , certiorari denied ; (C.A. 2), affirming , certiorari denied ; (C.A. 2), affirming , certiorari denied ; (C.A. 6), affirming Memorandum Opinion of this Court; (C.A. 9), affirming Memorandum Opinion of this ; ; *115 , affirmed per curiam (C.A. 3); , affirmed (C.A. 3). In the instant case, it is our opinion that the respondent's use of the bank deposit method was fully justified. There is no dispute that petitioner's accounting records were both incomplete and inadequate to reflect the taxable income; and indeed, the accountant, Jerome P. Cahill, who testified on behalf of the petitioner and who had made an extended analysis of the records, testified: "My personal opinion is that his books were inadequate to correctly reflect income." There was no cash book; and the only permanent accounting record was a socalled ledger that was maintained in single entry form by a bank employee, Roy D. Milliron, who visited petitioner's store about once a month for the purpose of making entries therein. This ledger reflected a hybrid system of accounting. Sales and expenses were recorded on a cash receipts basis, from cash register tapes and certain canceled checks; whereas costs of goods sold were determined on an accrual basis, from invoices which often had *116 not been paid, from certain canceled checks of which many had been issued to "cash," and from inventory figures which had been supplied by petitioner to Milliron. The latter acknowledged that in classifying expenses, he often could not tell whether they represented expenditures for the store or for petitioner personally; and that in entering merchandise purchases both from unpaid invoices and from canceled checks, there was no way to prevent duplication of particular items. In addition, there was an absence of supporting data for most of the entries shown in the returns. The only records, other than said ledger, which petitioner made available to respondent's agents were: Bank ledger sheets, canceled checks and check stubs relating to his checking account, that covered only the period from July 1947 to January 1950; no records for the checking account of petitioner's wife, except check stubs covering parts of the years 1946 and 1947; a bundle of unpaid invoices which were mostly for the year 1947; a few cash register tapes for 1949; and the pawn book above described, together with several envelopes of paid pawn tickets for parts of the years 1948 and 1949. None of these submitted *117 records was complete for any year. Also, there was no book record of capital assets, dividends and rents. At least two sales of capital assets, including a sale of certain corporate stock in 1947, and a bulk sale in 1946 of all merchandise in one of petitioner's stores for $35,000, were not reported at all in the returns. Petitioners have agreed to the correctness of the total bank deposits for all years involved, as determined by respondent's representatives. They have agreed also, that the adjustments made by respondent's agents for deposits of borrowed money, for transfers between bank accounts, and for deposits of withholdings and sales taxes are all correct so far as they go; but they contend that various additional adjustments should be made. It is necessary, therefore, for us to consider and weigh the evidence presented, respecting that portion of the bank deposits which respondent was unable to identify. After analyzing all the evidence, we hold that the following additional adjustments, which were claimed by the petitioners and which are not reflected in the respondent's determinations, should be made: For the year 1945, reductions from total de-
posits should be made as follows:
$ 705.88
representing taxable income of the
preceding year, which was not de-
posited until the beginning of 1945.
$1,000.00
representing redeposit of a loan
made by petitioner to his sister.
$1,300.00
representing redeposit of funds
previously withdrawn, and ex-
changed for check of S. R. Mend-
lin.
$1,590.00
representing a non-personal ex-
penditure from funds supplied by
by a third party for purchase of a
diamond (treated by respondent as
a cash expenditure of $1,570).
For the year 1946 - no adjustment. Peti-
tioner's accountant, Cahill, testified that
his examination disclosed no specific trans-
action of this year, for which respondent's
agents had not given credit. We, also, find
no basis for adjustment.
For the year 1947 - an additional deduction of $100 should be allowed, representing 50 per
cent of a capital loss of $200 on sale of cor-
porate stock in a newspaper.
For the year 1948 - a reduction from total de-
posits should be made in the amount of
$2,270, representing partial redeposit in one
bank account of a withdrawal of $2,275
made from another bank account.
For the year 1949 - no adjustment. In this
year the petitioner borrowed $4,000 from
one of the banks; but he did not testify
as to the purpose for which he made the
loan, or that the proceeds were deposited
in any of his accounts. There is no evi-
dence that such proceeds were deposited.
*118 We think that the evidence as a whole justifies the allowance of such additional adjustments, even though the evidence regarding the particular items is vague and somewhat unsatisfactory. It is our opinion that no adjustment should be made in respect of the following items claimed by petitioners: Checks for $833.63 and $4,764.60, received from Harris-Upham & Co. under dates of October 10, 1944 and December 11, 1944, respectively; and check for $5,000 received from A. O'B. Hogue under date of December 5, 1944 - all prior to the first year here involved. Petitioner testified that the two larger checks were "cashed" by him; and he did not testify that any of the three abovementioned checks were deposited in his bank acocunts, nor did he state what was done with the proceeds. Neither we nor respondent's representatives could find any evidence that any of these checks or the proceeds thereof, were deposited. They did find, however, that on the same date that the check for $833.63 was cashed, petitioner had made a payment on his loan account at the Beckley Bank in the amount of $1,000; and that on the same date that the larger Harris-Upham check was cashed, petitioner had made a payment *119 on said loan account of $4,000. Also $2,000 of Government bonds were found in petitioner's safe, which had been issued in December 1944. Alleged acommodation purchases of merchandise for one Sachs. Petitioner testified that the invoices for such merchandise were included in the cost of goods for his own store. Respondent has allowed credit for all such costs of goods. Moreover, petitioner's testimony regarding these transactions was indefinite; it did not establish either the dates or amounts of merchandise purchases, or that any repayments were deposited in his bank accounts during the years involved. $800 proceeds from sale of corporate stock in 1947. This sale was not reported by petitioner on his return for any year; and there is no evidence that the proceeds of the sale were deposited in any of his bank accounts. Loans made from Raleigh County Bank in 1947, in the amounts of $1,500 and $2,000. The $1,500 was borrowed on a note on May 26, 1947; on May 27, 1947, petitioner bought an automobile and paid $1,500 cash on account therefor; and on July 25, 1947, the above-mentioned note was renewed. Petitioner did not testify that the proceeds of either the $1,500 loan or *120 the $2,000 loan, above mentioned, were deposited in any of his bank accounts; and there is no evidence that they were so deposited. Miscellaneous other withdrawals from banks; and accommodation loans to friends. Petitioner's testimony regarding all these items was vague and indefinite. His accountant, Cahill, had no personal knowledge regarding any of them; and he testified that he could find no record of accommodation loans. There is no evidence that the amounts of any such transactions were deposited in any of the bank accounts. Alleged revolving fund for loans. Petitioner's accountant, Cahill, testified that he had received verbal information from petitioner that there was such a fund; but Cahill was unable to verify this from his examination of the accounts, and he merely conjectured that such fund might amount to $1,000, or $5,000 to $6,000, or $10,000. He suggested that such a fund might have originated with the Harris-Upham Co. check and the Hogue check above mentioned; but we have hereinbefore found that allowances for such checks can not be made, for the reasons we have stated. Moreover, we have found as a fact that petitioner executed and delivered to respondent's *121 agents, a written statement under oath in which he said that he never had cash on hand in any year in excess of $500; and this statement was reaffirmed by him at each of two subsequent conferences with said agents. There is no evidence of deposits having been made in the bank accounts from any such fund; and in our opinion no such revolving fund existed. We have given consideration to the attempts of petitioner's accountant, Cahill, to reconstruct petitioner's income, by applying estimated percentages of gross profit to various classes of merchandise sold in the store; and we reject his conclusions as being speculative and unreliable. Cahill acknowledged that he had no qualifications as an expert, to estimate profits from West Virginia sales of merchandise of the type here involved. Also, in applying his estimated percentages of profit, he relied on the "cost of goods sold" and "total receipts from business," as reflected in the so-called ledger and the returns, notwithstanding that we have found such records to be inadequate, incomplete and inaccurate. And, finally, his conclusions were concededly based on an assumption that all understatements of income were attributable to ureported *122 store sales - which we believe to be fallacious. The evidence discloses various sources, in addition to store sales, from which the amounts admittedly deposited in the various bank acounts could have been derived. As regards the deductions allowable in computing net income, no problem exists. The respondent allowed all deductions claimed on the returns, except for certain items disallowed in the notices of deficiency, in respect of which no error was assigned by petitioners. And we have hereinabove allowed an additional deduction for a capital loss not reported on petitioner's return, which is the only additional deduction that petitioner has claimed. We hold, from a consideration and weighing of all the evidence, that the amounts of net income reported on the returns here involved were understated in the amounts heretofore set forth in our Findings of Fact, as follows: Net income
Understatement
Year
per return
of net income
1945
$14,207.89
$25,055.61
1946
12,187.56
22,741.42
1947
11,180.47
19,365.31
1948
10,903.58
8,901.25
1949
5,021.79
6,981.68
Totals
$53,501.29
$83,045.27
II. We shall next consider the issues pertaining to fraud. *123 Specifically, the questions are whether additions to tax for fraud should be imposed for each of the years involved, under section 293(b) of the 1939 Code; [1] and whether, notwithstanding that the deficiency notices were not issued until more than 3 years after each of the returns was filed, the deficiencies and additions to tax for such years may be assessed under authority of section 276(a) of said Code, [2] on the ground that such returns were false or fraudulent with intent to evade tax. The burden of proving fraud is, *124 of course, upon the respondent. Section 1112, 1939 Code. The petitioners contend that respondent has failed to sustain this burden. We do not agree. To establish fraud by direct evidence is seldom possible; it usually must be gleaned from the surrounding circumstances. . In , in which the Supreme Court affirmed a conviction for fraudulent evasion of income tax computed under the net worth method, the court declared, at page 139, that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." Likewise, in the recent case of Schwarzkopf v. Commissioner, - Fed. (2d) - (July 10, 1957), affirming so far as pertinent a Memorandum Opinion of this , the Court of Appeals for the Third Circuit said: "Even if this case were devoid of the usual indicia of fraud, the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. See ; *125 (C.A. 4, 1955), * * *" Also, the Court of Appeals for the Sixth Circuit, in its decision in Epstein v. United States, - Fed. (2d) - (July 2, 1957), held that "The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade." Similar holdings also were made in the following cases, in all of which it was found that there was fraudulent evasion of income tax computed by reference to bank deposits. ; ; (C.A. 8), certiorari denied . Our determination of the large amounts of unreported income for the 5 years here involved, was not based on the presumptive correctness of the Commissioner's deficiency notices; rather, it was based on our analysis and weighing of all the evidence presented by both parties, which produced amounts different from those determined by the Commissioner. Also, such understatements did not result merely from adjustments of income or deductions shown on the returns, or from the resolving of any dispute as to whether a particular item or transaction was *126 subject to income tax; but, rather, they represent amounts of income which were unreported in a consistent pattern for a number of years. They were received by a highly intelligent, capable and experienced businessman who had several likely sources of income, but who did not keep records from which the amounts of his taxable income could be ascertained. Extensive investigations made both by the petitioner's accountant and by respondent's agents, and also the examination made by us of the evidence, have failed to reveal justification for the omissions. Even if all specific adjustments claimed by the petitioners had been allowed by us, there would still remain substantial unexplained understatements of income for all years. The petitioners, in their reply brief said: "Petitioners virtually concede the likelihood of understatement in each year at issue, and admit specific deficiencies in the years 1945 and 1946." After hearing the petitioner testify and observing his demeanor, and after analyzing all the evidence, and taking into consideration the principles set forth in the cases above cited, we are impelled to conclude that said understatements of income were due to willful intention *127 of the petitioner to conceal income and evade tax. We hold that at least part of the deficiency for each of the years involved was due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code; and that the return for each of such years was false or fraudulent with intent to evade tax, within the meaning of section 276(a). In view of this holding, it is unnecessary for us to consider the applicability of section 275(c), in respect of the years 1948 and 1949. Decisions will be entered under Rule 50. Footnotes
*. Excluding $6,959.81 selling price of securities, subject to capital gain treatment.↩
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2). ↩
2. SEC. 276 SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩